UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

BRADLEY H. FLEMING, individually,
and as Representative of a Class
of Participants and Beneficiaries
of the Kellogg Company Savings and
Investment Plan,

        Plaintiff,                          Case No: 1:22-cv-593

        v.                                CLASS ACTION COMPLAINT
                                        FOR CLAIMS UNDER
KELLOGG COMPANY,                 29 U.S.C. § 1132(a)(2)

        and

THE BOARD OF DIRECTORS OF
KELLOGG COMPANY

        and

ERISA FINANCE COMMITTEE OF
KELLOGG COMPANY

        and

ERISA ADMINISTRATIVE COMMITTEE
OF KELLOGG COMPANY

        Defendants

---

      COMES NOW Plaintiff, Bradley H. Fleming, individually and as representative of a Class of Participants and Beneficiaries of the Kellogg Company Savings and Investment Plan (the "Plan" or "Kellogg Plan"), by his counsel, WALCHESKE & LUZI, LLC and HANEY LAW FIRM, P.C., as and for a claim against Defendants, alleges and

asserts to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.     Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.     The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3.     The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4.     Even in a defined contribution plan in which participants are responsible for selecting their plan investments, *see* ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation* to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis

added.) "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5.     Defendants, Kellogg Company ("Kellogg"), the Board of Directors of Kellogg Company ("Board Defendants"), the ERISA Finance Committee of Kellogg Company, and the ERISA Administrative Committee of Kellogg Company ("Committee Defendants) (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as Kellogg Company Savings and Investment Plan (the "Plan" or "Kellogg Plan") – that it sponsors and provides to its employees.

6.     During the putative Class Period (June 28, 2016, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping fees [and managed account fees]," *Hughes,* 142 S. Ct. at 739-740, and by failing to timely remove their high-cost recordkeepers, Transamerica Retirement Solutions ("Transamerica") (2016-2020), and Fidelity Investments ("Fidelity") (2021-present).

7.     These objectively unreasonable recordkeeping and managed account fees cannot be contextually justified and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

8.     Defendants breached their fiduciary duty of prudence by causing the Plan participants to pay excessive recording and managed account fees. Defendants

unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan recordkeeping and managed account services.

9.      ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating recordkeeping and managed account fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

10.      There is no requirement to allege the actual inappropriate fiduciary actions taken because "a breach of fiduciary duty claim under ERISA can survive a motion to dismiss without 'well-pleaded factual allegations relating directly to the methods. employed by the ERISA fiduciary if the complaint alleges facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Comau LLC v. Blue Cross Blue Shield of Michigan*, 2020 WL 7024683, at *7 (E.D. Mich. Nov. 30, 2020) (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013)).

11.      The unreasonable recordkeeping and managed account fees paid inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

12.      These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

13.    To remedy these fiduciary breaches, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches of the duty of prudence.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

15.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.    Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

17.    In conformity with 29 U.S.C. § 1132(h), Plaintiff served the Complaint on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

18.    Plaintiff, Bradley H. Fleming, is a resident of the State of Michigan and currently resides in Portage, Michigan, and during the Class Period, was a participant and former participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

19.    Plaintiff started on July 31, 2006 as a Senior Accountant in charge of Kellogg North America Fixed Assets and supervised four Fixed Asset Accountants in

Battle Creek, Michigan. Plaintiff later became a Senior Tax Accountant in the Kellogg Tax Department in Battle Creek, Michigan, and left employment on August 2, 2019.

20.    Plaintiff was a participant in the Plan through 2020 and paid excessive recordkeeping and managed account fees during the Class Period. During his participation in the Plan, Plaintiff held investments in the Conservative Pre-Mix Portfolio and Kellogg Company Common Stock.

21.    Plaintiff has Article III standing as both a current and former Plan participant to bring this action on behalf of the Plan because he suffered an actual injury to his own Plan account through paying excessive recordkeeping and managed account fees during the the Class Period, that injury is fairly traceable to Defendants' unlawful conduct in maintaining Transamerica and Fidelity as its recordkeepers, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

22.    Although Plaintiff is a former participant in the Plan, he "has participant standing under Section 502(a)(2) because [he] still retains a colorable claim for vested benefits. For instance, in the event that [his] lawsuit on behalf of the Plan is successful, a restoration of benefits back to the Plan would result in a financial benefit to individual participants. Thus, Plaintiff sufficiently meets the requirements for statutory standing under ERISA §502(a)(2)." *See Allison v. L Brands, Inc.,* No. 2:20-CV-6018, 2021 WL 4224729, at *3 (S.D. Ohio Sept. 16, 2021.) Plaintiff also "satisfies the requirements necessary to establish constitutional standing." *Id.* at *4.

23.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injury.

24.     The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive recordkeeping and managed account fees) necessary to understand that Defendants breached their fiduciary duty of prudence until shortly before this suit was filed.

25.     Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

26.     Kellogg Company ("Kellogg") is a leading American produce of ready-to-eat cereals and other food products. Kellogg has over 31,000 employees worldwide, and its headquarters are located at One Kellogg Square, Battle Creek, MI 49016. In this Complaint, "Kellogg" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

27.     Kellogg acted through its officers, including the Board of Directors ("Board Defendants"), and the ERISA Finance and ERISA Administrative Committees ("Committee Defendants"), to perform Plan-related fiduciary functions in the course and scope of their business. Kellogg and its Board appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise

those appointees. For these reasons, Kellogg and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

28.　　The Plan Administrators are the ERISA Finance and ERISA Administrative Committees of the Kellogg Company (collectively "Committee Defendants"). As the Plan Administrators, Committee Defendants are fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Committee Defendants have exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

29.　　To the extent that there are additional officers and employees of Kellogg who are or were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers or consultants for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.

30.　　The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that Kellogg's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

31.     In 2020, the Plan had about $1,906,222,216 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Transamerica and Fidelity to ensure that they remained the prudent and objectively reasonable choices.

32.     With 12,244 participants in 2020, the Plan had more participants than 99.86% of the defined contribution plans in the United States that filed 5500 forms for the 2020 Plan year. Similarly, with $1,906,222,216 in assets in 2020, the Plan had more assets than 99.90% of the defined contribution plans in the United States that filed 5500 forms for the 2020 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE DEFINED CONTRIBUTION INDUSTRY

33.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

34.     Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

35.     Although Kellogg contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping fees or other types of Plan expenses.

36.     While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are a significant factor that affect plan participant's investment returns and impact their retirement income.

37.     Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices.

### Recordkeeping Services

38.     Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans with same level and caliber of services. Transamerica and Fidelity are two such recordkeepers.

39.     These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard bundled offerings of the same level and quality as other recordkeepers who service mega plans.

40.     There are two types of essential RKA services provided by all recordkeepers. For mega plans with substantial bargaining power (like the Plan), the first type, "Bundled RKA," is provided as part of a "bundled" fee for a buffet style level of

service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis). The Bundled RKA services include, but are not limited to, the following standard services:

a.   Recordkeeping;

b.   Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.   Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.   Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.   Maintenance of an employer stock fund;

f.   Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.   Plan consulting services including assistance in selecting the investments offered to participants;

h.   Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i.   Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j.   Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

41.    The second type of essential RKA services, hereafter referred to as "Ad Hoc RKA" services, provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees). These "Ad Hoc RKA" services typically include, but are not limited to, the following:

 a. Loan processing;

 b. Brokerage services/account maintenance;

 c. Distribution services; and

 d. Processing of Qualified Domestic Relations Orders (QDROs).

42.    For mega plans, like the Kellogg Plan, any minor variations in the level and quality of Bundled RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

43.    All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are inconsequential from a cost perspective to the delivery of the Bundled RKA services.

44.    The vast majority of fees earned by recordkeepers typically come from the fee for providing the Bundled RKA services as opposed to the Ad Hoc RKA services.

45.    Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

46.     Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

47.     Plan fiduciaries request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the plan.

48.     The Kellogg Plan had a standard level of Bundled RKA services, providing recordkeeping and administrative services of a nearly identical level and quality to other recordkeepers who also serviced mega plans during the Class Period.

49.     There is nothing in the service and compensation codes disclosed by the Plan fiduciaries in their Form 5500 filings during the Class Period, nor anything disclosed in the Participant section 404(a)(5) fee and service disclosure documents that suggests that the annual administrative fee charged to participants included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans with more than $500,000,000 in assets.

50.     By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the Kellogg Plan.

51.     Reasonable recordkeeping fees paid in 2018 are representative of the reasonable fees during the entire Class Period.

52.     The underlying cost to a recordkeeper of providing recordkeeping to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

53.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

54.     Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

55.     The Kellogg Plan paid revenue sharing to Transamerica, as disclosed on the Plan's Form 5500 forms during the Class Period.

56.     The amount of compensation paid to recordkeepers must be *reasonable* (not the cheapest or the average in the market).

57.     Reasonable, in turn, depends on contextually understanding the market for such recordkeeping services at the time that the recordkeeping contract is entered into.

**Managed Account Services**

58.     During the Class Period, Defendants selected and made available to Plan participants managed account services.

59.     In general, managed account services are investment services under which a participant pays a fee to have a managed account provider invest his account in a portfolio of preselected investment options.

60.     Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." The United States Government Accountability Office ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 14 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

61.     The assets of a participant signing up for a managed account service are managed based upon a program designed by the managed account provider that purportedly customizes the participant's portfolio based upon factors such as their risk tolerance and the number of years before they retire.

62.     In practice, there is often little to no material customization provided to the vast majority of plan participants which results in no material value to most, if not all, participants relative to the fees paid.

63.     Many managed account services merely mimic the asset allocations available through a target date fund while charging additional unnecessary fees for their services.

64.     Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the participant's account balance. The fee rates for these services are often tiered. For example, the first $100,000 of assets

may be charged a certain fee rate, the next $150,000 in assets at a lower fee rate, and all remaining assets at a still-lower fee rate. This is appropriate because the marginal cost to manage the additional assets for the participant is essentially $0.

65.     The cost to manage the account of a participant with $100,000 is the same as the cost to manage the account of a participant with $500,000.

66.     The participant has no control over the fee rate they are charged if they use the managed account service. The fee levels are determined at the plan level through a contractual agreement between the managed account provider and plan fiduciaries.

67.     For at least the past decade, mega plans have been able to negotiate multiple facets of the fees charged by managed account providers such as both the asset levels at which a particular fee tier starts (e.g., the highest tier applies to the first $25,000 versus the first $100,000), as well as the fee rate charged at each asset level.

68.     Managed account services are often offered by covered service providers to increase the revenue they generate through their relationship with a retirement plan.

69.     In many cases, the covered service provider will promote the managed account services over other potential solutions because the covered service provider will earn more revenue when participants use the managed account services.

70.    As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds that provide the materially same service (e.g., an automated time-based dynamic asset allocation creation and rebalancing solution).

71.    The costs of providing managed account services have declined and competition has increased. As a result, the fees providers are willing to accept for managed account services have been declining for many years.

72.    As with retirement plan service services, prudent fiduciaries will regularly monitor the amount of managed account service fees the plan is paying and will ensure the fees are reasonable compared to what is available in the market for materially similar services.

73.    The most effective way to ensure a plan's managed account service fees are reasonable is to periodically solicit bids from other managed account service providers, stay abreast of the market rates for managed account solutions, and/or negotiate most-favored nation clauses with the managed account service providers and/or the recordkeepers.

74.    Defendants caused Plan participants to pay excessive fees for the managed account services it made available to Plan participants by not periodically soliciting bids from other managed account service providers and/or not staying abreast of the market rates for managed account solutions to negotiate market rates.

## THE PLAN

75.     During the entire Class Period, the Plan received recordkeeping services from Transamerica and Fidelity.

76.     At all relevant times, the Plan's recordkeeping fees were objectively unreasonable and excessive when compared with other comparable 401(k) plans offered by other sponsors that had similar numbers of plan participants.

77.     The fees were also excessive relative to the level and quality of recordkeeping services received since the same level and quality of services are generally offered to mega plans, like the Kellogg Plan, regardless of the number of services selected by the Plan and regardless of the specific service codes utilized by the plan on the Form 5500.

78.     These excessive Plan recordkeeping fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

79.     During the Class Period, Defendants breached their duty of prudence to the Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for recordkeeping services.

80.     Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES
## SELECTING & MONITORING RECORDKEEPERS

81.    Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.

82.    Prudent plan fiduciaries can easily receive a quote from other record-keepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

83.    Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

84.    A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

85.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

86.    First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the record-

keeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

87.   Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

88.   Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

89.   Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

## PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RECORDKEEPING FEES AND THE PLAN THUS PAID UNREASONABLE RECORDKEEPING FEES

90.   A plan fiduciary must continuously monitor its recordkeeping fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

91.     During the Class Period, Defendants failed to regularly monitor the Plan's Bundled RK&A fees paid to recordkeepers, including but not limited to Transamerica and Fidelity.

92.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Transamerica and Fidelity, in order to avoid paying unreasonable Bundled RK&A fees.

93.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable Bundled RK&A fees it paid to Transamerica and Fidelity and in light of the level and quality of recordkeeper services it received.

94.     From the years 2016 through 2020, and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end recordkeeping fees illustrating that the Plan had on average had 14,685 participants and paid an average effective annual recordkeeping fee ("administrative service fees") of at least approximately $2,006,585, which equates to an average of at least approximately $137 per participant.

### Retirement Plan Services (RPS) Fees

|  | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|
| Participants | 17,036 | 16,248 | 15,324 | 12,575 | 12,244 | 14,685 |
| Est. RPS Fees | $1,544,143 | $1,797,314 | $2,019,323 | $2,018,785 | $2,653,358 | $2,006,585 |
| Est. RPS Per Participant | $91 | $111 | $132 | $161 | $217 | $137 |

95.     The fees paid by the comparable plans in the table below are derived

from publicly available information reported in 5500 forms and the accompanying financial statements that are required to be filed with the Department of Labor each year. An analysis of these documents allows for a determination of the direct and indirect compensation received by recordkeepers.

**Comparable Plans' RPS Fees Based on Publicly Available Information from Form 5500**
(Price Calculations are based on 2018 Form 5500 information)

| Plan | Partici-pants | Assets | RPS Fee | RPS Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $442,799 | $45 | Great-West | White |
| Southern California Perma-nente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| **Kellogg Plan Average Fee** | **14,685** | **$1,684,449,923** | **$2,006,585** | **$137** | **Transamerica** | **Red** |
| Michelin 401(K) Savings Plan | 16,521 | $2,380,269,826 | $570,186 | $35 | Vanguard | White |
| Fedex Office And Print Ser-vices, Inc. 401(K) Retire-ment Savings Plan | 17,652 | $770,290,165 | $521,754 | $30 | Vanguard | White |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | $655,384 | $36 | Great-West | White |
| JBS 401(K) Savings Plan | 19,420 | $374,330,167 | $657,336 | $34 | Great-West | White |

96.     From the years 2016 through 2020, and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual recordkeeping fees paid by other comparable plans with a similar number of participants and a similar amount of plan assets receiving a similar level and quality of services, compared to the average annual retirement plan service fees paid by the Plan (as identified in the

table above), with the white data points representing retirement plan service fees that recordkeepers offered to (and were accepted by) comparable plans.



97.    From the years 2016 to 2020 and based upon information derived from 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrates that the Plan paid an effective average annual recordkeeping fee of $137 per participant.

98.    From the years 2016 through 2020, and based upon information derived from 404(a)(5) participant fee disclosures and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, the table and graph

above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual recordkeeping fee of around $35 per participant, if not lower.

99.    From the years 2016 through 2020, and based upon information derived from 404(a)(5) participant fee disclosures and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other Plans of similar sizes with similar level and quality of services, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $2,006,585 per year in recordkeeping fees, which equated to an effective average of approximately $137 per participant per year.

100.   From the years 2016 through 2020, and based upon information derived from 404(a)(5) participant fee disclosures and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other Plans of similar sizes and with similar level and quality of services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for recordkeeping of approximately $513,989 per year, which equates to approximately $35 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan Fiduciary would not agree to pay almost four times what they could otherwise pay for materially the same level and quality of recordkeeping.

101.   From the years 2016 through 2020 and based upon information derived

from 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its participants on average approximately $1,492,596 per year in additional recordkeeping fees, which equates to on average approximately $102 per participant per year.

102.   From the years 2016 to 2020, and because Defendants did not act with prudence, and as compared to other Plans of similar sizes and with similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $7,462,978 in unreasonable and excessive recordkeeping fees.

103.   From the years 2016 to 2020, based upon information derived from 404(a)(5) participant fee disclosures and publicly available information reported on 5500 forms and the accompanying financial statements, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act prudently, and as compared to other Plans of similar sizes and with similar level and quality of services, the Plan actually cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $9,949,786 in recordkeeping fees.

104.   Defendants could have offered the exact same recordkeeping services at a lower cost by using a different recordkeeper but did not do so.

105.    Defendants could have received recordkeeping services during the Class Period of the same level and quality from Transamerica and Fidelity or other record-keepers that provide recordkeeping services to mega plan, like the Kellogg plan, because both the Plan 5500 forms and Plan fee disclosures to participants establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above. There is no evidence, based on these Plan documents, that the plan received any additional services.

106.    Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these recordkeeping allegations are not about reasonable tradeoffs between recordkeepers providing a different level or quality of services.

107.    Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeepers, Transamerica and Fidelity, and Defendants could have obtained the same Bundled RK&A services for less.

108.    Plaintiff paid these excessive Bundled RK&A fees in the form of direct compensation to the Plan and suffered injuries to his Plan account as a result of paying these excessive fees.

109.    During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's Bundled RK&A fees it paid to Transamerica or Fidelity.

110.   During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the Bundled RK&A fees it paid to Transamerica or Fidelity vis-à-vis the fees that other RK&A providers would charge, and would have accepted, for the same level and quality of services.

111.   During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's Bundled RK&A fees it paid to Transamerica or Fidelity, but Defendants either simply failed to do so, or did so ineffectively given that it paid over four times more for Bundled RK&A fees than it should have.

112.   During the entirety of the Class Period and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Bundled RK&A fees it paid to Transamerica and Fidelity, it would have realized and understood that the Plan was compensating Transamerica and Fidelity unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants and would have removed Transamerica and Fidelity as imprudent choices.

113.   The Plan Bundled RK&A fees were also excessive relative to the services received, since the quality and level of such services are standard for mega 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. Any difference in Bundled RK&A fees between comparable plans is not explained by the level and quality of services each

recordkeeper provides.

114.   During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Bundled RK&A fees than they should have been and/or by failing to take effective remedial actions including removing Transamerica and Fidelity as Plan recordkeepers, Defendants breached their fiduciary duty of prudence to Plaintiff and Plan participants, costing them millions of dollars in lost of retirement savings.

**THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR
MANAGED ACCOUNT SERVICE FEES AND, AS A RESULT,
THE PLAN PAID UNREASONABLE MANAGED ACCOUNT SERVICE FEES**

115.   Since at least 2016, Defendants have retained Financial Engines to provide managed account services to the Plan.

116.   According to Defendants' Participant Fee Disclosure documents, Financial Engines purported to provide participants with an asset allocation mix of funds available within the Plan.

117.   Plaintiff received these managed account services from Financial Engines and paid excessive fees for them.

118.   For this service, up through the end of 2020, Defendants required participants to pay an annual fee of at least 0.55% on the first $100,000, 0.40% on the next $150,000, and 0.25% on assets greater than $250,000.

119.   The table below illustrates the fee rates paid by similarly situated plans for virtually and materially identical managed account services.

| Managed Account service fee rates of similarly situated plans | Fee on 1st Tier | Fee on 2d Tier | Fee on 3d Tier |
|---|---|---|---|
| Kellogg "Financial Engines managed account service" | 0.55% | .40% | .25% |
| Verso Retirement Savings Plan for Bargained Employees (2021) | 0.25% | N/A | N/A |
| AGFA Healthcare Corp. Employee Savings Plan (2018) | 0.40% | 0.30% | 0.20% |
| Caterpillar Sponsored 401(k) Plans (2016) | 0.40% | 0.30% | 0.20% |
| Citi Ret. Savings Plan (2015) | 0.35% | 0.30% | 0.25% |
| JC Penney 401(k) Savings Plan (2015) | 0.35% | 0.25% | 0.10% |
| Comcast Corp. Ret. Investment Plan (2019) | 0.00% | 0.30% | 0.20% |

120.    As illustrated above, Plaintiff and other Plan participants are paying fee rates greater than participants in similarly situated plans.

121.    There are a number of other managed account providers whose services are virtually identical to the services provided to Plan participants through Financial Engines, whose fees range from 0.25% to 0.30% on all assets, e.g., Betterment, Vanguard, and Charles Schwab, for plans much smaller than the Plan.

122.    As a result, the fee rates paid by Plaintiff and Plan participants for the Financial Engines managed account services were excessive and not reasonable given the Plan's size and negotiating power.

123.    The Plan's managed account services added no material value to Plaintiffs or to other Plan participants to warrant any additional fees. The asset allocations created by the managed account services were not materially different than the asset allocations provided by the age-appropriate target date options ubiquitously available to Defendants in the market.

124.    The purpose of all the managed account services selected and made available by Defendants to Plan participants is identical, i.e., to provide an automated time-based dynamic asset allocation creation and rebalancing solution that reallocates the asset allocation over time as circumstances change.

125.    Although the United States Supreme Court noted in Hughes that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these managed account allegations are not about reasonable tradeoffs between managed account service providers offering a different level or quality of services.

126.    Rather, Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing managed account service provider, and Defendants could have obtained the materially same managed account services for less through another provider if it had solicited competitive bids for the same services.

127.    A prudent fiduciary would have conducted competitive solicitation of bids (including issuing an RFP, if necessary), as well as evaluating the incremental value provided to Plan participants, to ensure that the amounts paid by the Plan for managed account services were reasonable. Had Defendants done so, Plaintiff and other Plan participants would not have paid the excessive managed account service fees that it did to Financial Engines.

128.    Defendants' failure to properly monitor or control fees for the Plan's managed account services resulted in Plaintiff and other Plan participants paying

excessive and unreasonable fees and constitutes a separate and independent breach of the fiduciary duties of prudence.

129.    As a result, based on the value provided, the reasonable fee for Plan's managed account services provided by Financial Engines was zero or very close to zero, and the use of the managed account services provided by these service providers cost the Plan millions of dollars of wasted managed account service provider fees.

130.    Defendants' failure to properly monitor or control fees for the Plan's managed account service cost resulted in Plan participants paying excessive and objectively unreasonable fees, constitutes a separate and independent breach of the fiduciary duty of prudence.

## CLASS ACTION ALLEGATIONS

131.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

132.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Kellogg Company Savings and Investment Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning June 28, 2016 and running through the date of judgment.

133.    The Class includes over 12,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

134.   There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

    a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

    b.    Whether Defendants breached their fiduciary duties to the Plan;

    c.    What are the losses to the Plan resulting from each breach of fiduciary duty; and

    d.    What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

135.   Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a Participant during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

136.   Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he is a Participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

137.   Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent

or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

138. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

139. Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

140. The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

141. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

142.   Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

143.   Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

<u>FIRST CLAIM FOR RELIEF</u>
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against Committee Defendants –**
**<u>Recordkeeping Fees</u>)**

144.   Plaintiff restates the above allegations as if fully set forth herein.

145.   Committee Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

146.   29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Committee Defendants in their administration of the Plan.

147.   Committee Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable recordkeeping fees.

148.   During the Class Period, Committee Defendants had a fiduciary duty to do all of the following: ensure that the Plan's recordkeeping fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

149.    During the Class Period, Committee Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's recordkeeping fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

150.    During the Class Period, Committee Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the RKA services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided recordkeeping services at objectively unreasonable costs.

151.    During the Class Period, Committee Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeepers critically or objectively in comparison to other recordkeeper options.

152.    Through these actions and omissions, Committee Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

153.    Committee Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then

prevailing that a prudent person acting in a like capacity and familiar with such mat-
ters would have used in the conduct of an enterprise of like character and with like
aims, breach-ing its duties under 29 U.S.C. § 1104(a)(1)(B).

154.   As a result of Committee Defendants' breach of fiduciary duty of pru-
dence with respect to the Plan, the Plaintiff and Plan participants suffered millions
of dollars in objectively unreasonable and unnecessary monetary losses.

155.   Committee Defendants are liable under 29 U.S.C. §§ 1109(a) and
1132(a)(2) to make good to the Kellogg Plan the losses resulting from the breaches,
to restore to the Plan any profits defendants made through the use of Plan assets,
and to restore to the Plan any profits resulting from the breaches of fiduciary duties
alleged in this Count. In addition, Defendants are subject to other equitable relief as
set forth in the Prayer for Relief.

<u>SECOND CLAIM FOR RELIEF</u>
Breaches of Duty of Prudence of ERISA, as Amended
(Plaintiff, on behalf of himself and Class, Against Committee Defendants –
<u>Managed Account Service Fees)</u>

156.   Plaintiff restates the above allegations as if fully set forth herein.

157.   Committee Defendants is a fiduciary of the Plan under 29 U.S.C.
§§1002(21) and/or 1102(a)(1).

158.   29 U.S.C. §1104(a)(1)(B) imposes fiduciary duties of prudence upon
Committee Defendants in their administration of the Plan.

159.   Committee Defendants, as fiduciary of the Plan, is responsible for se-
lecting a managed account service provider that charges reasonable managed account
service fees.

160.    During the Class Period, Committee Defendants had a fiduciary duty to do all of the following: ensure that the Plan's managed account service fees were reasonable; manage the assets of the Plan prudently; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

161.    During the Class Period, among other things, Committee Defendants imprudently caused the Plan to pay excessive managed account service fees and failed to properly monitor and control those expenses.

162.    During the Class Period, Committee Defendants had a continuing duty to regularly monitor and evaluate the Plan's managed account provider to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding managed account services and the significant bargaining power the Plan had to negotiate the best fees.

163.    During the Class Period, Committee Defendants breached its duty to Plan participants, including Plaintiff, by failing to employ a prudent process to evaluate the cost of the Plan's managed account provider critically or objectively in comparison to other managed account options that were readily available.

164.    Committee Defendants' failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

165.    As a result of Committee Defendants breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff, and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

166.    Committee Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Committee Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

**THIRD CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against Defendants Kellogg and Board –**
**Recordkeeping Fees)**

167.    Plaintiff restates the above allegations as if fully set forth herein.

168.    Defendants Kellogg and Board had the authority to appoint and remove members or individuals responsible for Plan recordkeeping fees on the Committees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

169.    In light of this authority, Defendants Kellogg and Board had a duty to monitor those individuals responsible for Plan recordkeeping fees on the Committees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

170.   Defendants Kellogg and Board had a duty to ensure that the individuals responsible for Plan administration on the Committees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

171.   The objectively unreasonable and excessive recordkeeping fees paid by the Plan inferentially suggest that Defendants Kellogg and Board breached their duty to monitor by, among other things:

a.   Failing to monitor and evaluate the performance of individuals responsible for Plan recordkeeping fees on the Committees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably recordkeeping expenses;

b.   Failing to monitor the process by which the Plan's recordkeepers, Transamerica and Fidelity,  was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

c.   Failing to remove individuals responsible for Plan recordkeeping fees on the Committees whose performance was inadequate in that these individuals continued to pay the same recordkeeping costs even though solicitation of competitive bids would have shown that maintaining Transamerica or Fidelity as the recordkeepers

at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

172.   As the consequences of the foregoing breaches of the duty to monitor for recordkeeping fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

173.   Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants Kellogg and Board are liable to restore to the Kellogg Plan all loses caused by their failure to adequately monitor individuals responsible for Plan recordkeeping fees. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## FOURTH CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Plaintiff, on behalf of himself and Class, Against Defendants Kellogg and Board
– Managed Account Fees)**

174.   Plaintiff restates the above allegations as if fully set forth herein.

175.   Defendants Kellogg and Board had the authority to appoint and remove members or individuals responsible for Plan managed account fees on the Committees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

176.   In light of this authority, Defendants Kellogg and Board had a duty to monitor those individuals responsible for Plan managed account fees on the Committees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

177.   Defendants Kellogg and Board had a duty to ensure that the individuals responsible for Plan administration on the Committees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

178.   The objectively unreasonable and excessive managed account fees paid by the Plan inferentially suggest that Defendants Kellogg and Board breached their duty to monitor by, among other things:

a.   Failing to monitor and evaluate the performance of individuals responsible for Plan managed account fees on the Committees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably managed account expenses;

b.   Failing to monitor the process by which the Plan's managed account service provider, Financial Engines, was evaluated and failing to investigate the availability of more reasonably-priced managed account providers; and

c.   Failing to remove individuals responsible for Plan managed account fees on the Committees whose performance was inadequate in that these individuals continued to pay the same managed account costs even though solicitation of competitive bids would have shown that maintaining Financial Engines as the managed account

provider at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

179.    As the consequences of the foregoing breaches of the duty to monitor for managed account fees, the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

180.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants Kellogg and Board are liable to restore to the Kellogg Plan all loses caused by their failure to adequately monitor individuals responsible for Plan managed account fees. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable recordkeeping, managed account, and investment management costs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.  An Order requiring Defendant Kellogg to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Kellogg as necessary to effectuate relief, and to prevent Kellogg's unjust enrichment;

F.  An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.  An award of pre-judgment interest;

I.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.  Such other and further relief as the Court deems equitable and just.

Dated this 28th day of June, 2022

> *s/ Paul M. Secunda*_____
> Paul M. Secunda
> **WALCHESKE & LUZI, LLC**
> 235 Executive Dr., Suite 240
> Brookfield, Wisconsin 53005
> Telephone: (262) 780-1953
> E-Mail: psecunda@walcheskeluzi.com
>
> Troy W. Haney
> **HANEY LAW FIRM, P.C.**
> 330 E. Fulton
> Grand Rapids, MI 49503
> Telephone: (616) 235-2300
> Fax: (616) 459-0137
> E-Mail: thaney@troyhaneylaw.com
>
> *Attorneys for Plaintiff*