UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRADLEY H. FLEMING, individually,
and as Representative of a Class
of Participants and Beneficiaries
of the Kellogg Company Savings &
Investment Plan,

   Plaintiff,       Case No: 1:22-cv-00593-JMB-RSK

   v.         CLASS ACTION AMENDED
             COMPLAINT FOR CLAIMS
KELLOGG COMPANY, STEVEN   UNDER 29 U.S.C. § 1132(a)(2)
A. CAHILLANE,

   and

ERISA FINANCE COMMITTEE OF
KELLOGG COMPANY

   and

ERISA ADMINISTRATIVE COMMITTEE
OF KELLOGG COMPANY

   Defendants

COMES NOW Plaintiff, Bradley H. Fleming, individually and as representative of a Class of Participants and Beneficiaries of the Kellogg Company Savings and Investment Plan (the "Plan" or "Kellogg Plan"), by his counsel, WALCHESKE & LUZI, LLC and HANEY LAW FIRM, P.C., as and for a claim against Defendants, alleges and asserts to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.      Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.      The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3.      The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments [and service providers] and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4.      Even in a defined contribution plan in which participants are responsible for selecting their plan investments, *see* ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation* to determine which investments [and service providers] may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S.

at 529–530) (emphasis added.) "If the fiduciaries fail to remove an imprudent investment [or service provider] from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5. Defendants, Kellogg Company ("Kellogg"), Steven A. Cahillane, the ERISA Administrative Committee of Kellogg Company ("Administrative Committee"), ERISA Finance Committee of Kellogg Company ("Finance Committee") (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as Kellogg Company Savings and Investment Plan (the "Plan" or "Kellogg Plan") – that it sponsors and provides to its employees.

6. During the putative Class Period (June 28, 2016 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping fees," *Hughes*,142 S. Ct. at 739-740, and by failing to timely remove their high-cost recordkeeper, Transamerica Retirement Solutions ("Transamerica").[1]

7. These objectively unreasonable recordkeeping and administration ("RKA") fees cannot be contextually justified and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

---

[1] Fidelity became the Kellogg Plan recordkeeper effective January 8, 2021, and the time period from that point forward is not the subject of this suit.

8. Defendants breached their fiduciary duty of prudence by causing the Plan participants to pay excessive fees for recordkeeping and administration ("RKA" services. Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan RKA fees services.

9. ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating RKA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

10. There is no requirement to allege the actual inappropriate fiduciary actions taken because "a breach of fiduciary duty claim under ERISA can survive a motion to dismiss without 'well-pleaded factual allegations relating directly to the methods. employed by the ERISA fiduciary if the complaint alleges facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment [or service provider] at issue was improvident." *Comau LLC v. Blue Cross Blue Shield of Michigan*, 2020 WL 7024683, at *7 (E.D. Mich. Nov. 30, 2020) (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013)).

11. Courts "decline to add a pre-pleading requirement that plaintiffs ask nicely for information they need—but cannot compel access to—before filing their complaint." *Allen v. GreatBanc Tr. Co.,* 835 F.3d 670, 677 (7th Cir. 2016).

12. The unreasonable RKA fees paid inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

13.     These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

14.     To remedy these fiduciary breaches, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches of the duty of prudence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

18.     In conformity with 29 U.S.C. § 1132(h), Plaintiff served the initial Complaint on the Secretary of Labor and the Secretary of the Treasury.

19.     Plaintiff, Bradley H. Fleming, is a resident of the State of Michigan and currently resides in Portage, Michigan, and during the Class Period, was a participant and former participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

20.     Plaintiff started on July 31, 2006 as a Senior Accountant in charge of Kellogg North America Fixed Assets and supervised four Fixed Asset Accountants in Battle Creek, Michigan. Plaintiff later became a Senior Tax Accountant in the Kellogg Tax Department in Battle Creek, Michigan, and left employment on August 2, 2019.

21.     Plaintiff was a participant in the Plan through August 2020 and paid excessive RKA fees during the Class Period. During his participation in the Plan, Plaintiff held investments in the Conservative Pre-Mix Portfolio and Kellogg Company Common Stock.

22.     At no time, did Plaintiff receive any Plan communications about the institution of Plan arbitration provisions, and he never consented to such arbitration provisions during his participation in the Plan.

23.     Plaintiff was no longer a participant in the Plan when the Plan revised and updated its arbitration provisions effective January 1, 2021, so that amendment to the Plan has no impact on Plaintiff's right to bring this claim in a judicial forum.

24.     Plaintiff has Article III standing as both a current and former Plan participant to bring this action on behalf of the Plan because he suffered an actual injury to his own Plan account through paying excessive RKA fees during the Class Period, that injury is fairly traceable to Defendants' unlawful conduct in maintaining

Transamerica as its recordkeeper, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

25. Although Plaintiff is a former participant in the Plan, he "has participant standing under Section 502(a)(2) because [he] still retains a colorable claim for vested benefits. For instance, in the event that [his] lawsuit on behalf of the Plan is successful, a restoration of benefits back to the Plan would result in a financial benefit to individual participants. Thus, Plaintiff sufficiently meets the requirements for statutory standing under ERISA §502(a)(2)." *See Allison v. L Brands, Inc.,* No. 2:20-CV-6018, 2021 WL 4224729, at *3 (S.D. Ohio Sept. 16, 2021.) Plaintiff also "satisfies the requirements necessary to establish constitutional standing." *Id.* at *4.

26. Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injury.

27. The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive RKA fees) necessary to understand that Defendants breached their fiduciary duty of prudence until shortly before this suit was filed.

28. Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

29. Kellogg Company ("Kellogg") is a leading American produce of ready-to-eat cereals and other food products. Kellogg has over 31,000 employees worldwide, and its headquarters are located at One Kellogg Square, Battle Creek, MI 49016. In this Complaint, "Kellogg" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

30. Kellogg acted through its officers, including Mr. Cahillane, and the ERISA Finance and Administrative Committees ("Committee Defendants"), to perform Plan-related fiduciary functions in the course and scope of their business. Kellogg and Cahillane appointed other Plan fiduciaries on the Committees under Plan § 12.2(a) & (b), and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Kellogg and Cahillane are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

31. The Plan Administrator is the ERISA Administrative Committees of the Kellogg Company ("Administrative Committee"). As the Plan Administrator, the Administrative Committee is the fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Administrative Committee has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities and is the named fiduciary of the Plan under Plan § 12.3.

32. Under Plan § 12.4, the ERISA Finance Committee of the Kellogg Company ("Finance Committee") is the named fiduciary for the management and control

of the Plan Trust and has responsibility for the investment of the Plan Trust. The Finance Committee has discretionary authority to administer the Trust, including selecting the investments available to Plan participants.

33. The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that Kellogg's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

34. In 2020, the Plan had about $1,906,222,216 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Transamerica to ensure that it remained the prudent and objectively reasonable choice.

35. With 12,244 participants in 2020, the Plan had more participants than 99.86% of the defined contribution Plans in the United States that filed 5500 forms for the 2020 Plan year. Similarly, with $1,906,222,216 in assets in 2020, the Plan had more assets than 99.90% of the defined contribution Plans in the United States that filed 5500 forms for the 2020 Plan year.

<u>ERISA'S FIDUCIARY STANDARDS IN THE<br>DEFINED CONTRIBUTION INDUSTRY</u>

36. Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an

individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

37. Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

38. Although Kellogg contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping fees or other types of Plan expenses.

39. While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are a significant factor that affect plan participant's investment returns and impact their retirement income.

40. Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers, like recordkeepers, are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be prudent choices.

## Recordkeeping and Administration ("RKA") Services

41. Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the

needs of mega retirement plans with a prudent and materially identical level and caliber of services. Transamerica is one such recordkeeper.

42.     These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard bundled offerings of the materially identical level and quality as other recordkeepers who service mega plans.

43.     The fees charged by recordkeepers for RKA services are impacted by 1) the costs of providing the RKA services; 2) the competitive environment related to what other recordkeepers would charge to provide materially identical services; and 3) the revenues that a recordkeeper can generate from both the recordkeeping fees as well as other ancillary revenue based on the potential to manage proprietary investment options in the plan.

44.     Recordkeepers determine their willingness to accept fees for providing RKA services based on an evaluation of the potential profitability of a retirement plan services relationship.

45.     Providing RKA services involves both fixed and variable costs. The more participants in a plan, the greater proportion of the costs are variable costs which, in turn, means the closer the average cost per participant approaches the variable cost per participant.

46.     All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide identical RKA services to maintain the same profit margin rate.

47.     As a result, it is axiomatic in the retirement plan services industry that, all else being equal, the more participants in a plan, the lower the effective RKA fee per participant the plan can negotiate. All prudent plan fiduciaries and their consultants and advisors are aware of this industry dynamic.

48.     There are two types of essential RKA services provided by all recordkeepers. The first type, "Bundled RKA" services, include:

a.     Recordkeeping;

b.     Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.     Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.     Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.     Maintenance of an employer stock fund;

f.     Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.     Plan consulting services including assistance in selecting the investments offered to participants;

h.     Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

i.   Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j.   Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules; and

k.   Trustee / custodian services.

49.   The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees). These "A La Carte RKA" services typically include the following:

a.   Loan processing;

b.   Brokerage services/account maintenance;

c.   Distribution services; and

d.   Processing of Qualified Domestic Relations Orders (QDROs).

50.   The sum of the total Bundled RKA fees plus the total A La Carte RKA fees equals the total RKA fees.

51.   As the retirement plan services industry evolved over the past forty-plus years, the recordkeepers have developed automated or semi-automated processes for providing the RKA services.

52.   In practice, there are no material difference between the services that are offered and provided by national recordkeepers. Rather, some recordkeepers may differ in *how* they deliver the services.

53. As an example, because the RKA offering are materially identical among all recordkeepers who provide services to large plans, like the Kellogg plan, it is the standard and prevailing practice for retirement plan consultants and advisors (experts in the retirement plan industry) to request quotes by asking what the recordkeeper's revenue requirement is on a per participant basis for providing the Bundled RKA services.

54. Similarly, in most cases differences in fee rates for the A La Carte services are immaterial in determining the total fees charged by recordkeepers. To the extent that some recordkeepers have charged higher fees for these services, when those recordkeepers are in a competitive situation (in which they may not win the business), they will reduce their A La Carte fee rates to be competitive with what others are charging.

55. The same is true for the Bundled RKA fee rates charged by recordkeepers. Retirement plan consultant and advisors primarily use the Bundled RKA fee rate of different recordkeepers to make fee rate comparisons and determine whether the Bundled RKA fee rate is reasonable.

56. For mega plans, like the Kellogg Plan, any immaterial variations in the way certain services are received by one plan compared to another plan have an immaterial impact on the reasonable market rate for Bundled RKA services.

57. As a result, comparisons of the fees paid by similar sized plans are meaningful and provide a reasonable basis for determining whether an inference of imprudence is warranted based on the RKA fees being paid by any specific plan.

58. Additionally, any minor variation in the level and quality of Bundled RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

59. Since well before 2015, industry experts have maintained that for mega retirement plans like the Kellogg Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and record-keeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

60. Industry experts know that recordkeeping services have become a commodity for retirement plan fiduciaries; virtually every major recordkeeper provide the same core services. See, e.g., Allen Steinberg, *Unchecked Revenue: Show Me the Fees*, https://blog.retireaware.com/2018/01/12/unchecked-revenue/ (last visited Sep. 15, 2022); Fred Barstein, Investment News, *Potential Pru Retirement Sale a Cautionary Tale of a 401(k) Innovator*, https://www.investmentnews.com/prudential-retirement-sale-cautionary-tale-innovatio-205453 (Apr. 20, 2021) ("It is no wonder, but certainly disappointing, that one of the industry's most innovative providers, Prudential Retirement, is reportedly exploring a sale. That highlights how much record keeping has become a commodity focused on scale and costs.").

61. Fidelity, the largest 401k recordkeeper in the country, has conceded that the RKA services that it provides to mega Plans are commodified, including to its own Plan for its own employees.

62. As part of stipulated facts in another case, it stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. *Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*" See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

63. All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are inconsequential from a cost perspective to the delivery of the Bundled RKA services.

64. Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

65. Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

66. Plan fiduciaries request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the plan.

67. The Kellogg Plan had a standard level of Bundled RKA services, providing recordkeeping and administrative services of a nearly identical level and quality to other recordkeepers who also serviced mega plans during the Class Period.

68. There is nothing disclosed in the Participant section 404(a)(5) fee and service disclosure documents that suggests that the annual administrative fee charged to participants included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans with more than $500,000,000 in assets.

69. By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the Kellogg Plan. Reasonable recordkeeping fees paid in 2018 are representative of the reasonable fees during the entire Class Period. *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, ICI Research Perspective, at 4 (June 2021).

70. The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

71. Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

72. The Kellogg Plan paid revenue sharing to Transamerica, as disclosed on the Plan's Form 5500 forms during the Class Period.

73. The amount of compensation paid to recordkeepers must be *reasonable* (not the cheapest or the average in the market).

74. Reasonable, in turn, depends on contextually understanding the market for such recordkeeping services at the time that the recordkeeping contract is entered into.

## THE PLAN

75. During the entire Class Period, the Plan received recordkeeping services from Transamerica.

76. At all relevant times, the Plan's recordkeeping fees were objectively unreasonable and excessive when compared with the fees paid by other comparable 401(k) plans that had similar numbers of plan participants.

77. The fees were also excessive relative to the level and quality of recordkeeping services received since the same level and quality of services are provided to all mega plans, like the Kellogg Plan, any minor variation with respect to the use of

components of the standard offering 1) do not impact the Bundled RKA fee rates; and 2) are virtually always immaterial as it relates to the Total RKA fee rates and cannot reasonable explain the disparity between what the Plan paid and the market rate for the services received.

78. This is true regardless of the specific service codes listed by the plan on the Form 5500. *See* Droblyen, *supra*; Steinberg, *supra*; Barstein, *supra*. For example, all recordkeepers provide communications to plan participants but Fidelity does not list service code "38 Participant communication" in the Plan's Form 5500.

79. These excessive Plan recordkeeping fees led to lower net returns than the rates enjoyed by participants in comparable 401(k) plans.

80. During the Class Period, Defendants breached their duty of prudence to the Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for recordkeeping services.

81. Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

<u>STANDARD OF CARE FOR PRUDENT FIDUCIARIES
SELECTING & MONITORING RECORDKEEPERS</u>

82. Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same

level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DE-PARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Once you have a clear idea of your requirements, you are ready to begin receiving estimates from prospective providers. Give all of them complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

83. Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

84. It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated

and sized plans provides a good reference point in helping to determine if plan fees are reasonable.").

85. Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

86. A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

87. Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

88. First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

89. Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

90. Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

91. Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

## THE PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RECORDKEEPING FEES AND THE PLAN THUS PAID UNREASONABLE RECORDKEEPING FEES

92. A plan fiduciary must continuously monitor its RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

93. During the Class Period, Defendants failed to regularly monitor the Plan's Bundled RK&A fees paid to recordkeepers, including but not limited to Transamerica.

94. During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Transamerica, in order to avoid paying unreasonable Bundled RK&A fees.

95.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable RKA fees it paid to Transamerica and in light of the level and quality of recordkeeper services it received.

96.     From the years 2016 through 2020, the table below shows the actual year-end recordkeeping fees illustrating that the Plan had on average had 14,685 participants and paid an average effective annual recordkeeping fee ("administrative service fees") of at least approximately $2,006,585, which equates to an average of at least approximately $137 per participant.  These amounts are calculated by the Plan's Form 5500 filings and indicate the total RKA fees (the sum of the Bundled RKA fees and the A La Carte RKA fees).[1]

### Recordkeeping and Administration Services (RKA) Fees

|  | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|
| Participants | 17,036 | 16,248 | 15,324 | 12,575 | 12,244 | 14,685 |
| Est. RKA Fees | $1,544,143 | $1,797,314 | $2,019,323 | $2,018,785 | $2,653,358 | $2,006,585 |
| Est. RKA Per Participant | $91 | $111 | $132 | $161 | $217 | $137 |

97.     The fees paid by the comparable plans in the table below are also derived from publicly available information reported in 5500 forms and the accompanying financial statements that are required to be filed with the Department of Labor each

---

[1] "Est. RKA Fees" on the above chart are taken directly from the audited Financial Statements attached to the Kellogg Company Savings and Investment Plan Form 5500s.  The amounts are recorded as "Administrative service fees" on the Statements of Changes in Net Assets Available for Benefits which are audited by BDO USA an independent registered public accounting firm.  For 2018 through 2020, the same line item is used but that line item was renamed "Administrative and advisory fees."

year using the exact same methodology used to calculate the fees paid by the Plan above. An analysis of these documents allows for a determination of *the direct and indirect compensation* received by recordkeepers.

98.     More specifically, the methodology for computing these figures include the following: (1) take the direct compensation paid to each plan's Recordkeeper(s) directly from Schedule C of Form 5500; (2) review the investments held by the plan listed in the supplemental schedule to Form 5500, Schedule H, Part IV, Line 4(i) – Schedule of Assets; (3) review Schedule C, Part I, Line 3 for revenue sharing earned by investments in the plan; (4) cross-reference publicly available revenue sharing rates for investment options by recordkeeping platform and custody and trading partners to determine whether each investment option contains any revenue sharing and, if so, what the appropriate revenue sharing rate is for each investment option in the plan; (5) use the year-end assets for each investment option from Form 5500, Schedule H, Part IV, Line 4(i) and multiply it by the appropriate revenue sharing rate to determine the amount of indirect compensation earned by the recordkeeper; (6) review the notes of the Audited Financial Statement attachment to Form 5500; and (7) add the direct and indirect compensation together to arrive at the RKA Fee/pp.

## Comparable Plans RKA Fees Based on Publicly Available Information from Form 5500
### (Price Calculations are based on 2018 Form 5500 information)

| Plan | Partici-pants | Assets | RKA Fee | RKA Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $442,799 | $45 | Great-West | White |
| Southern California Perma-nente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| **Kellogg Plan Average Fee** | **14,685** | **$1,684,449,923** | **$2,006,585** | **$137** | **Transamerica** | **Red** |
| Michelin 401(K) Savings Plan | 16,521 | $2,380,269,826 | $570,186 | $35 | Vanguard | White |
| FedEx Office And Print Ser-vices, Inc. 401(K) Retire-ment Savings Plan | 17,652 | $770,290,165 | $521,754 | $30 | Vanguard | White |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | $655,384 | $36 | Great-West | White |
| JBS 401(K) Savings Plan | 19,420 | $374,330,167 | $657,336 | $34 | Great-West | White |

97. From the years 2016 through 2020, the graph below illustrates the annual Total RKA fees paid by other comparable plans (set forth in the table above) with a similar number of participants and a similar amount of plan assets receiving the materially identical level and quality of services, compared to the average annual retirement plan service fees paid by the Plan (as identified in the table above), with the white data points representing retirement plan service fees that recordkeepers offered to (and were accepted by) comparable plans.



98.    The trend line (dashed white in the graph above) generated from these data points represent a very reasonable estimate of the fee rate that several record-keepers serving the mega market would be willing to accept in a competitive environment to provide Bundled RKA services to the Plan.

99.    Any alleged minor differences in service levels or quality cannot explain the disparity of $102 per participant (a more than 291% premium), compared to the Total RKA fees paid by other comparable plans with similar amounts of participants

100.    From the years 2016 to 2020 and based upon information derived from 404(a)(5) participant fee disclosures and the 5500 forms and the accompanying financial statements, the table and graph above illustrates that the Plan paid an effective average annual recordkeeping fee of $137 per participant.

101.    From the years 2016 through 2020 and based upon information derived from 404(a)(5) participant fee disclosures and the 5500 forms and the accompanying

financial statements, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual recordkeeping fee of around $35 per participant, if not lower.

102. From the years 2016 through 2020, and based upon information derived from 404(a)(5) participant fee disclosures and the 5500 forms and the accompanying financial statements, and as also compared to other Plans of similar sizes with similar level and quality of services, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $2,006,585 per year in recordkeeping fees, which equated to an effective average of approximately $137 per participant per year.

103. From the years 2016 through 2020, and based upon information derived from 404(a)(5) participant fee disclosures and the 5500 forms and the accompanying financial statements, and as also compared to other Plans of similar sizes and with similar level and quality of services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for recordkeeping of approximately $513,989 per year, which equates to approximately $35 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan Fiduciary would not agree to pay *almost four times* what they could otherwise pay for materially the same level and quality of recordkeeping.

104. From the years 2016 through 2020 and based upon information derived from 404(a)(5) participant fee disclosures and the 5500 forms and the accompanying

financial statements, the Plan additionally cost its participants on average approximately $1,492,596 per year in additional recordkeeping fees, which equates to on average approximately $102 per participant per year.

105. From the years 2016 to 2020, and because Defendants did not act with prudence, and as compared to other Plans of similar sizes and with similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $7,462,978 in unreasonable and excessive RKA fees.

106. From the years 2016 to 2020, based upon information derived from 404(a)(5) participant fee disclosures and the 5500 forms and the accompanying financial statements, because Defendants did not act prudently, and as compared to other Plans of similar sizes and with similar level and quality of services, the Plan actually cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $9,949,786 in RKA fees.

107. Defendants could have offered the exact same RKA services at a lower cost by prudently negotiating with its current recordkeeper or by using a different recordkeeper but did not do so.

108. Defendants could have received RKA services during the Class Period of the same level and quality from Transamerica or other recordkeepers that provide recordkeeping services to mega plan, like the Kellogg plan, because both the Plan 5500 forms and Plan fee disclosures to participants establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above. There is no evidence, based on these Plan documents

and participant fee disclosures that the plan received any additional services or a higher level or quality of services that would warrant a higher fee.

109. Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these recordkeeping allegations are not about reasonable tradeoffs between recordkeepers providing a different level or quality of services.

110. Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeeper, Transamerica, and Defendants could have obtained the same Bundled RK&A services for less.

111. By 2021, the Plan negotiated with Fidelity to provide Bundled RKA services for $36 per participant, indicating that Plan fiduciaries could have had the same quality and level of RKA services as early as the beginning of the Class Period if Plan fiduciaries had used their significant bargaining power and leverage to locate Fidelity or another recordkeeper to provide materially identical RKA services as Transamerica.

112. Fidelity is not offering a lower level or quality of services such that the higher Bundled RKA fees paid to Transamerica prior to 2021 were warranted.

113. Plaintiffs paid these excessive RK&A fees in the form of direct and indirect compensation to the Plan and suffered injuries to his Plan account as a result of paying these excessive fees.

114. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's RK&A fees it paid to Transamerica.

115. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in a regular and/or effective examination and competitive comparison of the RK&A fees it paid to Transamerica vis-à-vis the fees that other RK&A providers would charge, and would have accepted, for the same level and quality of services.

116. During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's RK&A fees it paid to Transamerica, but Defendants either simply failed to do so, or did so ineffectively given that it paid over four times more for RK&A fees than it should have.

117. During the entirety of the Class Period, and had Defendants engaged in regular and/or effective examination and competitive comparison of the RK&A fees it paid to Transamerica, they would have realized and understood that the Plan was compensating Transamerica unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants and would have removed Transamerica.

118. During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher RK&A fees than they should have been and/or by failing to take effective remedial actions including either

removing Transamerica as Plan recordkeeper or obtaining a reasonable fee from Transamerica, Defendants breached their fiduciary duty of prudence to Plaintiff and Plan participants, costing them millions of dollars in lost of retirement savings.

<u>CLASS ACTION ALLEGATIONS</u>

119. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

120. In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Kellogg Company Savings and Investment Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning June 28, 2016 and running through the date of judgment.

121. The Class includes over 12,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

122. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

   a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

   b. Whether Defendants breached their fiduciary duties to the Plan;

c.     What are the losses to the Plan resulting from each breach of fiduciary duty; and

d.     What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

123.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a Participant during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

124.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he is a Participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

125.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

126. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

127. Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

128. The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

129. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

130. Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

131. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against Committee Defendants –**
**RKA Fees)**

132. Plaintiff restates the above allegations as if fully set forth herein.

133. Committee Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

134. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Committee Defendants in their administration of the Plan.

135. Committee Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable RKA fees.

136. During the Class Period, Committee Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

137. During the Class Period, Committee Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

138. During the Class Period, Committee Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper, Transamerica, to make sure it was providing the RKA services at reasonable costs, given the

highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided RKA services at objectively unreasonable costs.

139. During the Class Period, Committee Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeepers critically or objectively in comparison to other recordkeeper options.

140. Through these actions and omissions, Committee Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

141. Committee Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breach-ing its duties under 29 U.S.C. § 1104(a)(1)(B).

142. As a result of Committee Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

143. Committee Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Kellogg Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties

alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended (Plaintiff, on behalf of himself and Class, Against Defendants Kellogg and Cahillane – RKA Fees)

144. Plaintiff restates the above allegations as if fully set forth herein.

145. Defendants Kellogg and Cahillane had the authority to appoint and remove members or individuals responsible for Plan RKA fees on the Committees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

146. In light of this authority, Defendants Kellogg and Cahillane had a duty to monitor those individuals responsible for Plan RKA fees on the Committees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

147. Defendants Kellogg and Cahillane had a duty to ensure that the individuals responsible for Plan administration on the Committees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

148. The objectively unreasonable and excessive RKA fees paid by the Plan to Transamerica inferentially suggest that Defendants Kellogg and Cahillane breached their duty to monitor by, among other things:

a. Failing to monitor and evaluate the performance of individuals responsible for Plan RKA fees on the Committees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably RKA expenses;

b. Failing to monitor the process by which the Plan's recordkeeper, Transamerica, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

c. Failing to remove individuals responsible for Plan RKA fees on the Committees whose performance was inadequate in that these individuals continued to pay the same RKA costs even though solicitation of competitive bids would have shown that maintaining Transamerica as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

149. As the consequences of the foregoing breaches of the duty to monitor for RKA fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

150. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants Kellogg and Cahillane are liable to restore to the Kellogg Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RKA fees. In addition, Plaintiff

is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.  A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.  Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.  A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.  An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable RKA costs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.  An Order requiring Defendant Kellogg to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Kellogg as necessary to effectuate relief, and to prevent Kellogg's unjust enrichment;

F.  An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.  An award of pre-judgment interest;

I.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      Such other and further relief as the Court deems equitable and just.

Dated this 10th day of October, 2022

*s/ Paul M. Secunda*
Paul M. Secunda
**WALCHESKE & LUZI, LLC**
235 Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
E-Mail: psecunda@walcheskeluzi.com

Troy W. Haney
**HANEY LAW FIRM, P.C.**
330 E. Fulton
Grand Rapids, MI 49503
Telephone: (616) 235-2300
Fax: (616) 459-0137
E-Mail: thaney@troyhaneylaw.com

*Attorneys for Plaintiff*
